UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAYSEN VENTURA,

        Petitioner,

        v.

JAMES T. CONWAY, Superintendent, Attica Correctional Facility,

        Respondent.

**MEMORANDUM & ORDER**

06 Civ. 2926 (LBS)

SAND, J.

      Petitioner Jaysen Ventura, appearing *pro se*, filed the instant petition pursuant to 28 U.S.C. § 2254, in which he alleges that he is being held in state custody in violation of his federal constitutional rights. Petitioner's first trial in the Supreme Court of the State of New York, Bronx County ended in a mistrial. Upon retrial, Petitioner was convicted of one count of manslaughter in the first degree and one count of assault in the first degree, and was sentenced to thirty years imprisonment. Petitioner now raises four grounds for relief. First, he alleges that his retrial violated the constitutional prohibition of double jeopardy. Second, he claims that the verdict was against the weight of the evidence. Third, he alleges ineffective assistance of trial counsel. Fourth, he alleges ineffective assistance of appellate counsel.

      For the reasons set forth below, the petition is denied in its entirety.

**I.    Background**

      The evidence at Petitioner's second trial showed that on January 18, 2000, around 9:45 p.m., Petitioner was smoking marijuana with Derrick Brooks, Ivan Torres, and

1

others in the lobby of a building in the Bronx, New York housing project where Petitioner and Brooks lived. Petitioner and Brooks had a brief altercation resulting in a "play fight," after which Petitioner left. Tr. Oct. 2002 at 47:22–50:1, 571:25–574:2.[1] Shortly thereafter, a man entered, pulled out a black 0.9 millimeter semi-automatic gun, and began firing, killing Torres and seriously wounding Brooks. *Id.* at 50–52. After being taken to the hospital, Brooks told police that he had been shot by two masked men. According to Brooks' testimony at trial, he did not identify Petitioner because he intended to seek revenge himself and did not want to cooperate with the police. *Id.* at 80:7–25. Brooks changed his story after learning that his mother had spoken with detectives and identified Petitioner as the assailant. *Id.* at 82:9–17. After this conversation, John Wynne, then a detective with the New York City Police Department, began looking for Petitioner. *Id.* at 149:1–20. Wynne was assisting Detective Jeffrey Kaplowitz, who was assigned to the case. *Id.* at 147:17–19.

Petitioner was arrested on January 29, 2000, and brought to the 42nd Precinct. *Id.* at 513:20–514:5. Detectives Kaplowitz and Wynne arrived at the 42nd Precinct between noon and 1:00 p.m., and subsequently transferred Petitioner to the 48th Precinct. *Id.* at 513:20–22, 515:20–23. Detective Wynne read the *Miranda* warnings to Petitioner from a card which Petitioner signed and Detective Wynne initialed at 2:00 p.m. *Id.* at 155:1–6; 159:6–160:1. Detective Wynne then transcribed a statement from Petitioner, stating that Brooks attempted to slash Petitioner with a razor; Petitioner left to retrieve his gun, after Brooks taunted him to do so; and when Petitioner returned, he fired only after Brooks drew his razor again. *Id.* at 166:6–167:4. At 6:46 p.m., Petitioner made a videotaped

---

[1] Transcripts of Petitioner's first trial are henceforth cited as "Tr. Jan. 2002"; those of Petitioner's second trial as "Tr. Oct. 2002"; and those of the pre-trial suppression hearing before the first trial as "Tr. Hearing."

2

statement to an assistant district attorney at the Bronx Homicide Task Force where he repeated these allegations.  Moore Decl. Ex. 21.  The weapon used to kill Torres and wound Brooks was recovered on April 3, 2000, by Detective Robert Rodriguez of the Bronx Warrants Squad of the New York City Police Department.  Tr. Oct. 2002 at 437:1–438:15.  Detective Rodriguez was executing an arrest warrant for one Patricia McFadden, and recovered the weapon from the room of one Clyde Darrisaw, who was arrested that day.  *Id.* at 457:17–19, 458:13–22.

Petitioner was indicted on February 22, 2000, Indictment Number 789/00, and charged with two counts of murder in the second degree, one count each of manslaughter in the first degree and attempted murder in the second degree, two counts of assault in the second degree, two counts of criminal use of a firearm in the first degree, and one count of criminal possession of a weapon in the second degree.  Petitioner moved to suppress the statements he made to the police; on October 29, 2001, a hearing was held in the Supreme Court of the State of New York, Bronx County.  Petitioner's motion was denied in its entirety on November 16, 2001.

Petitioner's first trial commenced on January 2, 2002.  Deliberations began on January 18, 2002.  On January 22, the second day of deliberations, the jury sent a note stating that it could not reach a verdict; the jury resumed deliberations after the trial court delivered an instruction following *Allen v. United States*, 164 U.S. 492 (1896).  Tr. Oct. 2002 at 706:23–710:11.  Later that day the jury requested an instruction on reasonable doubt.  *Id.* at 713:1–7.  On January 23, the jury sent another note stating that it could not reach a verdict.  *Id.* at 723:3–5.  On January 25, the fourth day of deliberations, the prosecutor stated to the trial court that he had received intelligence that Petitioner, while

being transported back to Rikers Island, told another inmate that "he felt good" about the case because there were two members of the Bloods gang on the jury. *Id.* at 766:25–767:3. Based on this information, the prosecution ran the names of various jurors through the "Bronx DA system," a public record, and found four jurors who had lied with respect to being defendants in criminal proceedings. *Id.* at 753:20–21. Juror No. 2, Richard Carney, had been issued a desk appearance ticket in 1995 for possession of heroin; the case remained unresolved. *Id.* at 754:16–19. Juror No. 3, Gaylord Brown, had been arrested for felony assault in 1996 and pleaded guilty to harassment. *Id.* at 756:4–10. Juror No. 4, Diane Alexander, was convicted of petit larceny on November 21, 1984. *Id.* at 757:11–18. Juror No. 9, Sherene Graham, had divulged one previous felony conviction, but failed to disclose seven other convictions. *Id.* at 758:23–25. The prosecutor asserted that Bloods members in the audience made hand signals to defendant during the trial, that Graham was a member of the Bloods, and that she made a thumbs-up sign to someone in the audience. *Id.* at 763:25–764:7; 765:1–24. The prosecutor later clarified that the intelligence identifying Graham as a member of the Bloods was incorrect. *Id.* at 785:18–25.

The prosecutor moved to disqualify the four jurors, and in the alternative for a mistrial. *Id.* at 768:10–15. The trial court inquired of the four jurors in question, all of whom admitted to their prior convictions and claimed that they could and would be impartial in their deliberations. *Id.* at 793–807. The court then denied the prosecutor's request to discharge the four jurors, and deliberations resumed. *Id.* at 820:20–24. On Monday, January 28, 2002, the jurors sent a note stating that they could not reach a decision. *Id.* at 826:4–7. The court declared a mistrial on agreement of both parties. *Id.*

4

at 827:11–24, 829:4–16.  On February 1, 2002, Petitioner moved for an order granting dismissal of the indictment on the ground that the prosecutor had tampered with a deliberating jury.  On March 8, 2002, the court denied the motion.  Moore Decl. Ex. 4.  On August 22, 2002, Petitioner moved for an order vacating the court's November 16, 2001 order denying his earlier motion to suppress his pretrial statements; the court denied the new motion on October 3, 2002.  Petitioner was retried, and on November 14, 2002, he was convicted of Manslaughter in the First Degree, New York Penal Law § 125.20[1], and Assault in the First Degree, New York Penal Law § 120.10[1], and sentenced to consecutive terms of imprisonment of twenty-two and eight years respectively.

Petitioner appealed his conviction to the Supreme Court of New York, Appellate Division, First Department.  On appeal, Petitioner raised two claims.  First, Petitioner alleged that his first mistrial was intentionally provoked by the Assistant District Attorney, violating his rights of due process and against double jeopardy.  Second, Petitioner alleged that the jury's verdict of guilty was against the weight of the evidence, because that evidence clearly indicated that his confessions were involuntary and false.  The Appellate Division unanimously affirmed Petitioner's judgment of conviction on December 14, 2004.  *See People v. Ventura*, 786 N.Y.S.2d 469 (N.Y. App. Div. 2004).  Petitioner applied for leave to appeal that decision to the New York Court of Appeals, which denied his application on March 31, 2005.  *See People v. Ventura*, 4 N.Y.3d 836 (N.Y. 2005) (unpublished table decision).

On March 28, 2006, Petitioner filed a petition for a writ of habeas corpus to this Court under 28 U.S.C. § 2254.  Petitioner moved this Court to stay this petition on June 21, 2006, so that he could exhaust his claims of ineffective assistance of trial and

appellate counsel in state court; this motion was granted on June 27, 2006.  Moore Decl. Exs. 11, 14.  Petitioner filed a petition for a writ of error *coram nobis* in the Appellate Division, First Department on March 21, 2007.  Moore Decl. Ex. 15.  This petition was denied on June 3, 2008.  Moore Decl. Ex. 18.  The New York Court of Appeals denied Petitioner leave to appeal the Appellate Division's decision on December 16, 2008.  Moore Decl. Ex. 19.  In January 2009, Petitioner filed in this Court a second memorandum in support of his petition for a writ of habeas corpus.

**II. Discussion**

   **a. Standard of Review**

A federal habeas court considering a petition under 28 U.S.C. § 2254 may not review "state-court determinations on state-law questions," *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991), and may only grant the petition on the grounds that the petitioner's custody is "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A claim under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Statute ("AEDPA"), will succeed if the petitioner shows that the state court decision was "contrary to, or involved an unreasonable application of, clearly established federal law."  28 U.S.C. §§ 2254(d)(1)–(2).  "Clearly established federal law" is determined only by consideration of the holdings of the Supreme Court of the United States, and "the holdings of the various courts of appeals or . . . the dicta of the Supreme Court [cannot] provide the basis for habeas relief."  *Rodriguez v. Miller*, 537 F.3d 102, 106–07 (2d Cir. 2008) (internal citation omitted).

With respect to the "contrary to" clause, the writ may be issued if (1) the state court decision is contrary to Supreme Court precedent on a question of law; or (2) if the

state court decision addresses a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrives at a result different than that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application" of Supreme Court precedent when the state court either "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. In order to establish that a state court decision is an unreasonable application of Supreme Court precedent, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The decision must be "objectively unreasonable." *Id.*

The petitioner can also prevail by showing that the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)–(2). Factual determinations made by the state court are presumed to be correct, and the Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### b. Double Jeopardy Claim

"The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense," but "does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Oregon v. Kennedy*, 456 U.S. 667,

7

671–72 (1982). "Where a defendant either objects or fails to consent to a trial court's declaration of a mistrial, double jeopardy will bar a second prosecution unless there was a manifest necessity for the mistrial. No manifest necessity analysis is required, however, when a defendant requests a mistrial, or consents to one, unless the government or the court acts in a manner intended to provoke a defendant to move for a mistrial." *Maula v. Freckleton*, 972 F.2d 27, 28–29 (2d Cir. 1992) (internal quotation marks and citations omitted). "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Oregon v. Kennedy*, 456 U.S. at 675–76.

Here, Petitioner claims that the prosecution instigated the trial court's examination of four jurors for false statements regarding prior criminal offenses, and that this examination constituted tampering with the jury. "The queried jurors, with the prosecutor in the room, had to have been intimidated and worried about their previous false statements." Pet. Mem. Jan. 2009 at 36. Petitioner theorizes that this intimidation caused the deadlock, relying on a statement made by two jurors to defense counsel that a single holdout prevented a verdict of not guilty. If the holdout was one of the four jurors questioned by the trial court, reasons Petitioner, that juror refused to vote not guilty out of fear. If the holdout was not one of the four questioned jurors, Petitioner contends, the questioning nevertheless brought a premature end to deliberations since the four jurors, intimidated by their examination, did not attempt to persuade the holdout.

Petitioner's claims are without merit. First, his theory of the prosecution's intent is wholly speculative. The prosecution's investigation of the jurors did not itself interfere

with the jury's deliberations, since this investigation was conducted without the jury's knowledge.[2] Therefore, Petitioner's only possible claim is that the prosecutor intended to use any gang affiliations or undisclosed criminal records uncovered by the investigations to intimidate individual jury members. This purely hypothetical theory of the prosecution's intent is belied by the fact that the prosecution vehemently opposed examining the four jurors with undisclosed criminal records, arguing instead that they should be dismissed outright. Tr. Oct. 2002 at 778:17–779:5. In any event, the prosecution failed to secure their dismissal, and the trial court allowed the jurors to return to deliberations after they made assurances that they would be able to judge the evidence impartially. Far from intimidating the four jurors, the trial judge allowed them to continue serving, and rejected the prosecution's attempt to have them dismissed.

Second, Petitioner's theory of how the trial court's questioning precipitated a mistrial is also wholly speculative. Neither Petitioner nor his appellate or trial counsel offered any record evidence—in the form of affidavits or other testimony from jurors—substantiating his theory that all members of the jury but one voted for acquittal. The only such claim came in an unproven allegation from trial counsel that he had spoken to two members of the jury after the mistrial had been declared. Even if this unverified

---

[2] Petitioner also attacks the prosecution's "outrageously overinclusive investigations" of the jury, arguing that the tip that two female members of the jury were members of the Bloods did not justify checking all the jurors—particularly male jurors—for criminal records. Pet. Mem. Jan. 2009 at 36. The prosecution responded that its initial tip, which resulted in the investigation, did not specify the gender of the jurors who were gang members. Petitioner now attacks this as further proof of the prosecution's "bad intentions." *Id.* However, in colloquy with the trial judge and defense counsel during deliberations, the prosecutor stated that he first heard that jurors of undetermined gender were members of the Bloods, and then conducted his inquiries. Only after those inquiries, with a visit from a corrections officer who had more specific information, did the prosecutor learn that this boast concerned female jurors. Tr. Oct. 2002 at 766:21–768:15. The prosecutor made his statement before defense counsel raised the objection that the investigations should not have included male jurors. *Id.* at 781:20–782:2. Therefore, the prosecutor's statements were not bad-faith *post-hoc* attempts to justify an overinclusive investigation of the jury. In any event, the trial court noted that "it was incumbent on the People to bring to our attention the fact that certain jurors had allegedly not disclosed prior criminal convictions." *Id.* at 784:6–9.

9

statement is accepted, Petitioner's hypothesis that the holdout may have been one of the four jurors questioned by the trial court has no factual basis whatsoever.  Even more speculative is Petitioner's alternative theory that if the holdout was not one of the four questioned jurors, the trial court's questioning nevertheless precipitated a mistrial because the four jurors refrained from persuading the holdout to vote for acquittal.  Before the prosecution raised the issue of gang members on the jury, the jury had already submitted two notes to the trial court stating that they were unable to reach a verdict.  The impasse existed before the prosecution intervened, refuting Petitioner's hypothesis that said intervention resulted in the mistrial.

In short, Petitioner's claim that his second trial violated the constitutional prohibition of double jeopardy rests on mere conjecture, with no evidentiary support.  Accordingly, Petitioner's retrial did not violate the Double Jeopardy Clause of the Fifth Amendment.

### c.  Claim of Verdict Against the Weight of the Evidence

The Supreme Court has held that "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  "But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318–19 (internal quotation marks omitted).

Petitioner claims that the verdict against him was against the weight of the evidence. He offers his own testimony that he was transferred from the 42nd Precinct to the 48th Precinct between 9:00 and 10:00 a.m. on January 29, 2000, and subjected to a coercive interrogation for four to five hours before signing statements. He avers that he received no *Miranda* warnings until after the interrogators produced a written statement and pressed him to sign it. Finally, he claims that the interrogators tricked him by promising a short sentence based on self-defense, and making him feel guilty because of his father's occupation in law enforcement. While Detectives Wynne and Kaplowitz stated that Petitioner's statements were not coerced, and that they did not begin interrogating him until the afternoon, he casts doubt on their credibility by alleging factual inconsistencies in their testimony. Because his testimony is consistent and that of the detectives was inconsistent, Petitioner claims, the weight of the evidence does not support his conviction.

"Under 28 U.S.C. § 2254(e)(1), the fact-findings of the trial court are subject to a presumption of correctness, a presumption that is particularly important when reviewing the trial court's assessment of witness credibility . . . ." *Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003) (internal quotation marks and citations omitted). Here, as in *Cotto*, the credibility issue "has been resolved by findings of the Trial Judge (who observed the witnesses)—affirmed by the Appellate Division—that the People's evidence was credible, the contrary evidence not." *Id.* On a habeas corpus petition, this Court's scope of review of such determinations is "extremely narrow," with Petitioner required to rebut

11

"the presumption of correctness by clear and convincing evidence." *Id.* Petitioner has failed to produce such evidence. None of the alleged inconsistencies he cites casts doubt on the detectives' credibility,[3] and in any event, "issues of witness credibility are to be resolved by the jury and are not to be redetermined by federal courts in a habeas corpus proceeding." *Henry v. Scully*, 918 F. Supp. 693, 708 (S.D.N.Y. 1995) (internal quotation marks omitted).

Moreover, the prosecution provided ample evidence corroborating the claims in the detectives' statements and proving guilt beyond a reasonable doubt. This included the testimony of Derrick Brooks, one of Petitioner's victims; ballistics testimony and medical evidence of the bullets fired at Brooks and Ivan Torres; and physical evidence of the bullets recovered from the scene and a 0.9 millimeter pistol recovered from the bedroom of Clyde Darrisaw, a friend of Petitioner. Petitioner has also failed to rebut Detective Wynne's testimony that he had no prior knowledge of or acquaintance with Petitioner, and no motive to fabricate evidence or testimony implicating him.

Accordingly, Petitioner has not met his burden of showing that the record evidence at trial could not allow any rational trier of fact to find proof of guilt beyond a reasonable doubt. Therefore, he is not entitled to relief under *Jackson v. Virginia*.

---

[3] Petitioner cites the following alleged inconsistencies in the detectives' testimony: (1) at the first trial Kaplowitz stated that Petitioner's confessions took place at the 42nd Precinct, but at the second trial he stated that they took place at the 48th Precinct; (2) at the first trial Kaplowitz stated that he delivered *Miranda* warnings to Petitioner, but at the second trial he stated that Wynne delivered them; (3) at the second trial Kaplowitz initially testified that he could not recall whether he knew at the time of questioning Petitioner that the gun involved was a 0.9-millimeter handgun, but admitted in questioning that he wrote a report reflecting such knowledge; (4) at the second trial Kaplowitz told defense counsel that he knew nothing about Petitioner's father's occupation when questioning Petitioner, but upon further questioning stated that he possessed such knowledge; (5) Wynne claimed that it took him three to four hours to respond to the call that Petitioner had been detained because he had to dress and eat breakfast; (6) the *Miranda* card filled out by Petitioner contained only a single handwritten "yes," casting doubt on the claim that all his *Miranda* rights were read to him. These inconsistencies are all inconsequential even if established. Most were resolved upon cross-examination, and Petitioner offers no reason to construe them as malicious misrepresentations rather than inaccurate recollections made in good faith.

12

### d.  Ineffective Assistance of Trial Counsel Claim

An ineffective assistance of counsel claim under the Sixth Amendment is governed by the standard in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under this standard, the defendant must first "show that counsel's performance was deficient," and second, "must show that the deficient performance prejudiced the defense."  *Id.* at 687.  To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "Unless a defendant makes both showings" of deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  *Id*. at 687.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Id.* at 688.  Scrutiny of such performance "must be highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 690.

Trial counsel's vigorous representation of Petitioner—shown in the multiple pre-trial motions he filed, his conduct and cross-examination at trial, and his opposition to the prosecution's investigations of the first jury—belies any allegation that his representation constituted ineffective assistance of counsel.  Nevertheless, Petitioner claims that trial counsel's performance was deficient because he allegedly (1) failed to argue that Petitioner's arrest was illegal; (2) failed to investigate Clyde Darrisaw, in whose apartment the murder weapon was found; (3) failed to object to a photograph of the murder weapon surrounded by drug paraphernalia; (4) asked to be removed after the first

13

trial. Petitioner did not raise this ineffective assistance of trial counsel claim on direct appeal or in his petition for a writ of error *coram nobis* before the Appellate Division. To avoid procedural default of the claim, he must show cause for this failure, an inquiry that ultimately relies on its merits.[4]

Petitioner's claim is meritless. First, he attacks the evidence that led to his arrest. He argues that at the pre-trial evidentiary hearing his trial counsel should have questioned Brooks' identification of him in the photo array, assuming that if counsel had done so, he

---

[4] The Government argues that Petitioner has failed to exhaust the remedies available for his ineffective assistance of trial counsel claim in state courts, since exhausting his claim of ineffective assistance of appellate counsel did not exhaust his underlying claim regarding trial counsel. Nevertheless, the Government urges this Court to deny this unexhausted claim on the merits, citing 28 U.S.C. § 2254(b)(2). While district courts must dismiss habeas petitions mixing exhausted and unexhausted claims, *Rose v. Lundy*, 455 U.S. 509, 522 (1982), the Second Circuit has held that a claim of ineffective assistance of trial counsel "never fairly presented to a state court for review" was nevertheless exhausted by the Appellate Division's adjudication of a *coram nobis* claim of ineffective assistance of appellate counsel, even though the latter decision never mentioned trial counsel, because that decision renders it "doubtful . . . that any avenue remains open" for a claim regarding trial counsel "in state court." *Aparicio v. Artuz*, 269 F.3d 78, 90–91 (2d Cir. 2001). This is because "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal." *Id.* at 91 (citing N.Y. Crim. Proc. Law ("CPL") § 440.10(2)(c)). In *Aparicio*, as here, the petitioner failed to raise his ineffective assistance of trial counsel claim on direct appeal, and his only means of justifying this failure pursuant to CPL § 440.10(2)(c)—claiming ineffective assistance of appellate counsel—was foreclosed by the Appellate Division's denial of his *coram nobis* petition. Therefore, "any state court to which Petitioner might now present this claim would almost certainly find it procedurally barred," and therefore exhausted. *Aparicio*, 269 F.3d at 91. Accordingly, in the instant case, Petitioner's claim of ineffective assistance of trial counsel was exhausted.
   The Government does not contend that this exhausted claim is nevertheless procedurally defaulted under *Coleman v. Thompson*, 501 U.S. 722, 735 (1991), but CPL § 440.10(2)(c) explicitly defaults Petitioner's claim regarding trial counsel. CPL § 440.10(2)(c) is a state law ground for decision that is independent of federal questions and adequate to support the judgment. *Aparicio*, 269 F.3d at 92–93. A petitioner can obtain federal review of a claim defaulted by an independent and adequate state procedural rule only on a showing of cause and prejudice, or actual innocence. *Coleman*, 501 U.S. at 750. Petitioner does not allege the latter. As for the former, the Supreme Court has held that "existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). This standard applies to appellate as well as trial counsel. *Id.* at 492. Petitioner has made no such showing here; as discussed *infra* Part E, he merely alleges that appellate counsel failed to raise an ineffective assistance of trial counsel claim, and that this failure in itself constituted ineffective assistance on appeal. Therefore, Petitioner is only left with the merits of his trial counsel claim. In *Aparicio*, the Second Circuit held that because the petitioner's underlying claim was meritless, "Petitioner's trial counsel was not ineffective for failing to raise it. And thus, Petitioner's appellate counsel was not ineffective for failing to raise the ineffectiveness of trial counsel[,]" a finding that "rebuts any contention that the ineffectiveness of Petitioner's appellate counsel is adequate cause to excuse the procedural default of the claim that trial counsel was ineffective[.]" *Aparicio*, 269 F.3d at 99 n.10 (order of quotations reversed). Accordingly, this Court must now look to the merits of Petitioner's ineffective assistance of trial counsel claim to determine whether this claim is procedurally defaulted.

14

could have shown that Petitioner's arrest was illegal. Detective Kaplowitz testified at the hearing that Brooks declined to sign the photo array when he viewed it on January 18, 2000 because of IVs inserted into his arms. Tr. Hearing at 69:17–70:24. At trial, Brooks testified that he was physically able to sign his signature on that date. Tr. Jan. 8, 2002 at 173:5–7; Tr. Oct. 3, 2002 at 117:6–8. However, Brooks was not available at the pre-trial hearing to rebut Detective Kaplowitz's testimony, and trial counsel argued to the judge presiding over the hearing that Brooks should be heard. Tr. Hearing Oct. 29, 2001 at 96:12–17. Furthermore, trial counsel elicited Brooks' testimony that he could have signed the array on cross-examination at both the first and second trials. In other words, trial counsel made this issue of Brooks' absent signature available to the fact-finder both at the hearing and at trial, and in both cases the fact-finder concluded that it did not impugn the legality of Petitioner's arrest. There was no failure giving rise to ineffective assistance of counsel.[5]

Petitioner also questions whether the search of the apartment where he was arrested was consensual, arguing that his trial counsel should have questioned the apartment's owner. As a preliminary matter, Petitioner did not raise this claim in his

---

[5] Petitioner also cites Brooks' testimony that he could not see the person who fired the gun at him, Tr. Jan. 2002 at 71:6–13, arguing that this evidence supports his claim that his trial counsel failed in his duties. Petitioner presumably assumes that such testimony in the hands of competent counsel would have resulted in acquittal. However, trial counsel asked Brooks about this testimony on cross-examination, Tr. Jan. 2002 at 114:12–14, and referred to it in summation. Tr. Jan. 2002 at 507:9–10. Finally, Petitioner faults his counsel for not objecting at the pre-trial hearing to Detective Kaplowitz's testimony regarding the photo array, claiming that this improperly bolstered Brooks' testimony and was therefore inadmissible pursuant to *People v. Trowbridge*, 305 N.Y. 471 (1953). Petitioner also argues that trial counsel should have interviewed Brooks' mother, since a tip from her led Kaplowitz to investigate Petitioner, and argues that admission of Kaplowitz' testimony regarding Brooks' mother's statements at the hearing violated *Crawford v. Washington*, 541 U.S. 36 (2004). Here, Petitioner mistakenly confuses evidence inadmissible at trial with evidence that can be considered at a pre-trial evidentiary hearing; it is well-settled that a court making a determination of admissibility "is not bound by the rules of evidence except those with respect to privileges." Fed. R. Evid. 104(a). Therefore, any failure to object at the trial hearing did not prejudice Petitioner. Petitioner does not allege that trial counsel failed to object to Detective Kaplowitz's testimony at trial, or that any such failure prejudiced him; on the contrary, trial counsel persistently attacked Detective Kaplowitz's credibility at both trials.

petition for a writ of error *coram nobis* to the Appellate Division or on appeal to the New York Court of Appeals, and therefore he has failed to exhaust state remedies for it. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This claim also fails on the merits. Petitioner has provided no evidence suggesting that if counsel had interviewed the apartment owner, he would have discovered that the search and Petitioner's arrest were non-consensual and therefore illegal. Such "speculative claims concerning an error's impact are insufficient to establish prejudice" under *Strickland*. *United States v. O'Neil*, 118 F.3d 65, 73 (2d Cir. 1997) (citing *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991)).

Second, trial counsel's alleged failure to interview Clyde Darrisaw did not constitute ineffective assistance of counsel because Petitioner has failed to show that questioning Darrisaw could have yielded any exculpatory information. As Petitioner admits, Darrisaw—who had possession of the weapon that killed Torres and wounded Brooks when he was arrested on April 3, 2000—was incarcerated during the time of the incident. Petitioner claims that his trial counsel's failure to question Darrisaw meant that he did not discover this potentially "exculpatory evidence," Pl. Mem. at 51, which the prosecution allegedly withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *People v. Rosario*, 9 N.Y.2d 286 (N.Y. 1961). However, Petitioner does not offer even a speculative hypothesis as to the exculpatory information that an investigation of Darrisaw might have yielded. The mere fact of Darrisaw's incarceration does not exculpate Petitioner; on the contrary, it strengthens the case against him by eliminating a possible alternative suspect. This allegation cannot support a claim of ineffective assistance of counsel. Nor can it constitute a *Brady* violation by the prosecution, because Petitioner

has not shown that whatever information he sought would have been material to the issue of his guilt.  *See Brady*, 373 U.S. at 87 ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment.").

Third, Petitioner's claim that his counsel should have objected to the picture of the murder weapon is a pure question of strategy.  Rather than oppose its introduction by the prosecution, trial counsel seized upon the picture as evidence of Petitioner's innocence.  Regarding the gun and the picture of it, counsel stated at the second trial, "Obviously, I would have liked to have called that evidence and presented it to you because I think it's very favorable to the defendant because it connects that gun to what I submit to you is another drug gang who could be responsible for the murder."  Tr. Oct. 2002 at 696:20–24.  Trial counsel's interpretation of the picture supported his theory, propounded throughout both trials, that two masked men shot Torres and Brooks, not Petitioner.  Petitioner has failed to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland*, 466 U.S. at 690 (internal quotation marks omitted).

Fourth, Petitioner cites trial counsel's request to be relieved after the first trial as evidence that he rendered ineffective assistance, claiming that "an attorney who does not want to represent a defendant is like not having a lawyer at all."  Pet. Mem. at 48.  However, "a criminal defendant's right freely to choose his counsel is not absolute."  *United States v. Di Tommaso*, 817 F.2d 201, 219 (2d Cir. 1987).  To warrant substitution of counsel, "the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an

17

apparently unjust verdict." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972). Petitioner has made no such showing here. Trial counsel's performance at the first trial contributed to a deadlocked jury, and at the second trial he presented substantially the same case he presented at the first, offering evidence, raising objections, and questioning witnesses in the same manner. Petitioner has not alleged any actual or potential conflict of interest giving rise to inadequate representation, such as representation of co-conspirators or implication of counsel in a related crime. *See, e.g.*, *United States v. Fulton*, 5 F.3d 605, 612–13 (2d Cir. 1993) (identifying these as examples of conflicts resulting in inadequate representation). Nor has he alleged any breakdown in communication. Finally, after the first trial, Petitioner expressed satisfaction with his counsel's performance; when counsel made his application to be relieved, Petitioner told the trial court that "I really don't want to release him." Tr. Jan. 2002 at 830:15–16, 832:1–3.

Accordingly, Petitioner has failed to raise a claim for ineffective assistance of trial counsel under the Sixth Amendment and *Strickland v. Washington*. Petitioner's claim is procedurally defaulted under *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[6]

### e. Ineffective Assistance of Appellate Counsel Claim

Appellate counsel does not have a constitutional duty to raise every colorable claim suggested by a client. "Nothing in the Constitution or our interpretation of that document requires such a standard." *Jones v. Barnes*, 463 U.S. 745, 754 (1983). Instead, an ineffective assistance of appellate counsel claim is governed by the standard in *Strickland v. Washington*, 466 U.S. 668 (1984), discussed *supra*. *See Bunkley v. Meachum*, 68 F.3d 1518, 1521 (2d Cir. 1995) (adopting *Strickland* test for ineffective

---

[6] *See supra* note 4.

18

appellate counsel claims). Under this standard, "a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Petitioner's ineffectiveness claim was rejected by the Appellate Division in adjudicating his petition for a writ of error *coram nobis*. Therefore, Petitioner's current claim for relief should be granted only if the Appellate Division's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

Here, Petitioner's claim of ineffective assistance of appellate counsel relies solely and entirely upon his allegation of ineffective assistance of trial counsel, and appellate counsel's supposed failure to raise this latter claim on the appeal of his conviction to the Appellate Division. Because Petitioner's underlying claim regarding the performance of trial counsel is without merit, *see supra* Part D, his claim regarding the performance of his appellate counsel is similarly without merit.

Accordingly, Petitioner has failed to show that the Appellate Division's decision denying his petition for a writ of *coram nobis* violated the Sixth Amendment and *Strickland v. Washington.*

### III.   Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because Petitioner's claims do not raise issues of constitutional law about which reasonable jurists could disagree or which are fairly debatable, we decline to issue a

Certificate of Appealability. *See Miller-El v. Cockrell*, 537 U.S. 322, 342–43, 347 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

SO ORDERED.

Dated: January 10, 2011
      New York, NY

                                            U.S.D.J.